# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

DONALD RONALD REIF,

                Plaintiff,                              Case No. 3:13-cv-2052-ST

        v.                                 **OPINION AND ORDER**

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

                Defendant.

**STEWART, Magistrate Judge**.

Plaintiff, Donald Reif ("Reif"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. This court has jurisdiction under 42 USC § 405(g) and § 1383(c). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket #19).

Because the Commissioner's decision is not supported by substantial evidence, it is reversed and remanded for immediate payment of benefits.

## ADMINISTRATIVE HISTORY

Reif filed applications for SSI and DIB on January 22, 2004, alleging disability as of January 1, 2004.  Tr. 59-61.[1]  After the Commissioner denied his applications initially and upon reconsideration, Reif requested a hearing before an Administrative Law Judge ("ALJ") who found him not disabled in a written opinion dated June 16, 2006.  Tr. 19-26.  When the Appeals Council declined to review the ALJ's decision (Tr. 5-9), Reif appealed the decision in the district court which ordered a remand in January 2008 to consider new treating source evidence. Tr. 417-39.

On remand, a supplemental hearing was held in September 2008 (Tr. 697), resulting in a second unfavorable decision by another ALJ dated November 26, 2008 (Tr. 697-708), which was remanded by the Appeals Council in June 2011 to consider new treating, examining and vocational source evidence.  Tr. 711-16.  After another hearing held in November 2011 (Tr. 832-84), the ALJ once again found Reif not disabled in a decision dated December 20, 2011. Tr. 396-412.  This appeal followed.

## FACTS

### I.    Background

Born in November 1946, Reif was 57 years old on the alleged onset date.  Tr. 59.  He has a high school education and worked for 37 years from 1965 to 2004 as a copy machine salesman and technician.  Tr. 145, 262, 341.  He received on-the-job training throughout his career. Tr. 262, 341-42.  Since 2005 he has worked on a part-time basis performing maintenance and janitorial work.  Tr. 746, 866-67.

///

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed on May 28 and October 6, 2014 (dockets #13 & #18).

## II.    <u>Medical Evidence</u>

Reif's medical record reflects a history of anxiety disorder since childhood with symptoms including unpredictable and unexplained fear, hyperventilation, dry mouth, increased heart rate, muscle tension, isolation, restlessness, forgetfulness, confusion, headaches, insomnia, nightmares, and suicidal ideation, as well as chronic cardiovascular disease.  Tr. 217, 219-20, 225, 234, 246-49, 272, 319-20, 753, 758, 765, 771, 788, 838-39.  In April 2002, Reif reported to the emergency room with an acute anxiety episode that he believed to be a stroke.  Tr. 232, 271-72.  After this incident, Reif became increasingly concerned by the sense that he was losing his short-term memory.  Tr. 220, 334.  On January 1, 2004, Reif's employer cut his hours because he failed to complete tasks and could no longer travel out of town for trainings.  Tr. 220, 343-44, 348-49.  In January 2005, Reif stopped working as a copy machine servicer altogether.

Curtis Climer, M.D., who was Reif's primary care provider between August 2001 and January 2005, provided treatment primarily for chronic hypertension and generalized anxiety. Tr. 216-51.  In May 2002, Dr. Climer noted stroke-like symptoms followed by disrupted sleep in January 2003.  Tr. 225, 230.  In 2004, managing Reif's anxiety became a principal focus of Dr. Climer's treatment.  Tr. 217, 247-49.

In February 2004, state agency consultant Frank Lahman, Ph.D., reviewed the medical record and found anxiety disorder, but assessed only mild limitations in maintaining social functioning.  Tr. 199, 209.

In July 2005, David Mitchell, M.D., assumed primary care when Reif relocated.  Tr. 254, 363.  Dr. Mitchell acknowledged that ongoing "TIA" (stroke) symptoms had been difficult to understand.  Tr. 306-07, 611.  He was chiefly concerned with a chronic anxiety complex dating to 1968 (Tr. 307, 320, 619), some suicidal ideation (Tr. 308), and chronic cardiovascular disease

with postural hypotension and hyponatremia. Tr. 319, 320-21, 613, 615-16.  Noticing persistent

unease and lack of focus, he thought Reif seemed chronically disabled.  Tr. 306-07.

       In December 2005, after the initial hearing at the request of the state agency, Michael

Leland, Psy.D., evaluated Reif and obtained valid MMPI and Test of Memory scores.  Tr. 260-

92.  He found that Reif functions in the low-average to average range in memory, and shows

borderline impairment on auditory delayed and general memory, with extreme impairment in

delayed auditory recognition.  Tr. 270.  Dr. Leland diagnosed generalized anxiety disorder and

obsessive compulsive disorder, and opined that the anxiety disorder posed Reif's greatest barrier

to employment.  Tr. 272-73, 296-300.  Dr. Leland identified some "slight" functional limitations,

but opined that Reif's abilities to perform and remember tasks could be improved by writing

down instructions.  Tr. 301.

       In a letter dated August 5, 2006, after the first ALJ decision, Dr. Mitchell opined that Reif

suffered from chronic anxiety and chronic cardiovascular disease and limited Reif to no more

than eight hours of work per week.  Tr. 319.  Accordingly, in September 2006, Dr. Mitchell

assessed marked limitations in Reif's ability to complete a normal workday and workweek, to

maintain attention, concentration or pace, or to perform activities within a schedule.  Tr. 328-29,

331.  Dr. Mitchell also assessed moderate limitations in several other areas of Reif's mental

residual functional capacity.  Tr. 329.

       On August 30, 2006, after reviewing the records, Dr. Lahman concurred with the other

state agency physicians' assessments of anxiety disorder and obsessive compulsive disorder.

Tr. 597-609.  Viewing Reif's anxiety as transitory and related to crowd exposure, Dr. Lahman

assessed moderate difficulties in interacting with the general public, as well as mild limitations in

concentration, persistence and pace.  Tr. 594-95, 602, 607.

In 2008, after another relocation, Reif established care with Erin Shawn, F.N.P., and Katrina McAlexander, P.M.H.P.  Tr. 666-70.  Ms. McAlexander diagnosed schizoaffective and generalized anxiety disorders, causing marked limitations in memory, attention, concentration, and Reif's ability to carry out detailed instructions.  Tr. 765, 767-69, 771.  She assessed moderate limitation in Reif's ability to understand, remember, and carry out simple instructions, and in sustaining an ordinary routine without special supervision.  Tr. 767-68.  Ms. Shawn assessed Reif with chest pain and hypertension and possible schizophrenia.  Tr. 663, 668-70.

A lumbar spine x-ray dated December 28, 2008, showed "significant narrowing at L2-3-5-SI with degenerative changes at the facet joints."  Tr. 783.

On January 22, 2009, after the second ALJ decision, Caleb Burns, Ph.D., performed a psychological evaluation of Reif.  Tr. 745-54.  Dr. Burns found "no signs of exaggeration or malingering" and noted that "his attention and concentration appear[ed] to be reasonably good."  Tr. 752.  Dr. Burns assessed functional limitations in logical memory, moderate to severe depression, panic disorder with agoraphobia, schizoaffective disorder well controlled, and memory deficits.  Tr. 752-53.  He concluded due to Reif's "memory deficits, he is easily confused, finds it difficult to focus on more than several things at a time, and can no longer be placed in work situations that are not routinized."  Tr. 753.

On January 31, 2009, Amy Cowan, M.D., performed a physical evaluation of Reif at the request of the state agency, but did not review any imaging.  Tr. 757-64.  She found Reif was able to lift 50 pounds frequently and 25 pounds occasionally or perform work at a medium exertion level.  Tr. 763.

Another lumber spine x-ray on November 4, 2009, showed "mild multilevel degeneration" with "disc and bony disease" from L2 to S1.  Tr. 824.  In November 2009,

Ms. Shawn stated that Reif "suffers from lower back pain secondary to degenerative changes in lumbar spine" and restricted him to "light or modified work" with no lifting over 20.  Tr. 831.

Margaret Moore, Ph.D., was called by the ALJ to testify as a medical expert at the third hearing on November 28, 2011.  Tr. 837-63.  Based on her review of the records, she confirmed that Reif suffered from long-term anxiety, but found no convincing evidence of schizoaffective disorder, stroke, or cognitive loss.  Tr. 839-42.  She described the record as reflecting "diagnosis creep" since his presumed stroke in 2002 (Tr. 842) and noted "particularly around 2004, that [Reif] made it very clear that he was looking to have early retirement."  Tr. 844.  She found Dr. Leland's report to be "far and away one of the better exams that I have seen" with "respectable" testing and analysis and had little to add.  Tr. 844.  However, she noted that Reif "would be very non-functional" if his performance "as below the first percentile" on one test "were accurate and an accurate depiction of his ability," causing her to wonder "did he lose focus, did he not try."  Tr. 845-46.  In contrast, she found Dr. Burns's evaluation "very much different and very less helpful and less discriminating."  Tr. 346.  In sum, Dr. Moore opined that Reif did not meet the criteria for Listing 12.06 related to anxiety type conditions.  Tr. 848.  She also found that Reif had a mild impairment regarding concentration, persistence and pace, but acknowledged that "on occasions when his anxiety is more profound, it might rise to the moderate level, but not on a consistent basis."  Tr. 848.

### III.    Reif's Testimony

Reif testified at the first hearing in November 2005 that he began having problems with anxiety at age 18, but was able to work for many years despite his symptoms.  Tr. 342-43.  Reif's anxiety problems increased in 2004 and began to cause performance problems, such that by March 2004 he worked only about six hours per week and stopped working by July 13, 2005.

Tr. 343, 345.  He takes medication for anxiety, blood pressure, depression, and cholesterol which cause side effects of lightheadedness and dizziness, and impede his driving.  Tr. 342-43, 346.  He lives alone in a mobile home (Tr. 156) and is able to prepare meals, do yard work and laundry, and occasionally visit a friend and neighbor.  Tr. 351-52.  He experiences dizziness about three times a day for a half-hour to an hour.  Tr. 356.

At the supplemental hearing in September 2008, Reif again testified regarding his symptoms and limitations similar to his testimony at the 2005 hearing.  Tr. 403, 703.[2]  By then, he worked part-time as a janitor which involved minimal stress.  *Id*.  Reif provided similar testimony regarding his ongoing symptoms and limitations during the third hearing in November 2011.  Tr. 863-72.  He stated that he has short-term memory loss and that, despite taking medications, does not function well when he has to do anything "out of the ordinary or at work or meeting anybody, doing anything different" which increases his anxiety.  Tr. 871-72**.**

## IV.    **Vocational Expert Testimony**

On March 18, 2009, after the supplemental hearing in September 2008, Senior Vocational Consultant Karl Smith, M.S., wrote a letter to Reif's counsel.  Tr. 776-79.  Reviewing the reports of Dr. Leland and Dr. Burns, Mr. Smith opined that Reif's ability to perform the essential duties of copy machine repair had eroded.  Tr. 778.  Although Reif retained "some general skills and the physical abilities" to perform jobs such as a semi-conductor assembler or electronics accessories assembler, he would have "difficulty working regular hours."  Tr. 778.  "Thus, one could not expect him to work in an assembly situation where there is very little 'slack' given to any of the employees without major accommodations. . . . In other words,  he needs a very sheltered work situation."  Tr. 778-79.  Mr. Smith questioned whether Reif could

---

[2] The record does not contain a transcript of that hearing.  Therefore, the court relies on the summary of that testimony by the ALJ.

work full-time as a janitor even though it was "in a very simple and straightforward and likely fairly controlled worksite." *Id*. In sum, he found that Reif "is not a truly competitive employee for the general labor market, even in positions for which he has skills and abilities." Tr. 779.

At the November 2011 hearing, Vocational Expert ("VE") Paul Morrison testified that an individual of Reif's age and education with no exertional or skill limitations who is limited to "routine tasks," not working in crowds or crowded areas, and only superficial interaction with co-workers could not perform Reif's past work. Tr. 873-74. However, Reif's assembly repair skills would transfer to semi-skilled jobs, such as circuit board assembler and electronic motor assembler. Tr. 874-76. If the individual was limited to "simple, repetitive, routine work," then he could not perform semi-skilled jobs. Tr. 877. In addition, the VE testified that an individual who was "off-task 10% of the time," including when checking a notebook or when "going blank," could not sustain competitive work in the fields he identified. Tr. 879-80.

## ALJ'S FINDINGS

The ALJ engaged in the five-step sequential inquiry to determine whether a claimant is disabled. 20 CFR §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ found that Reif had not engaged in substantial gainful activity after his alleged onset date of January 1, 2004. Tr. 399. At step two, the ALJ found that Reif has a severe impairment related to an anxiety disorder. *Id*. At step three, the ALJ found that Reif did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 401.

The ALJ next assessed Reif's residual functional capacity ("RFC") and determined that he could perform work at all exertional levels, but must avoid concentrated exposure to noise,

avoid working in crowds or crowded areas, and have only superficial interaction with coworkers. Tr. 402.

At step four, the ALJ found Reif could not perform any of his past relevant work. Tr. 410. At step five, based on the VE's testimony, the ALJ determined that Reif had acquired work skills from past relevant work that are transferable to other jobs that exist in significant numbers in the national economy, including printed circuit board assembler (light, semi-skilled), electric motor assembler (light, semi-skilled), and small products assembler (light, unskilled). Tr. 410-11. The ALJ therefore concluded that Reif is not disabled. Tr. 411.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'" *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

///

///

**DISCUSSION**

Reif asserts that the ALJ erred by: (1) rejecting his subjective symptom testimony; (2) rejecting the lay testimony; (3) failing at step two to find his lumbar spine impairment to be severe; and (4) failing to incorporate the credible medical evidence into the RFC.

I.    **Reif's Testimony**

The ALJ rejected Reif's testimony to the extent that it conflicted with the RFC.  Tr. 404. Reif contests this finding.

The Ninth Circuit has developed a two-step process for evaluating the credibility of a claimant's own testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue*, 572 F3d 586, 591 (9th Cir 2009).  First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Lingenfelter*, 504 F3d at 1036.  Second, "if the claimant meets the first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'"  *Id*, quoting *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).  The ALJ's overall credibility determination may be upheld even if not all of the ALJ's reasons for rejecting the claimant's testimony are supported by substantial evidence.  *Batson*, 359 F3d at 1197.

Reif presented objective medical evidence of an anxiety disorder that could produce his alleged symptoms, and the record contains no evidence of malingering.  Therefore, the ALJ was required to provide clear and convincing reasons to reject his testimony about the severity of his symptoms.

The ALJ first rejected Reif's testimony because he was able to work for many years despite his anxiety disorder. Tr. 402. This is not a clear and convincing reason. It is clear from the record that Reif's anxiety symptoms progressed and escalated over time. *See, e.g.,* Tr. 272 (Dr. Leland's December 19, 2005 note that "the nature of [Reif's] anxiety and his management of these symptoms fluctuates across time"). The issue is whether he could continue working full-time after January 1, 2004, due to that progressing anxiety.

The ALJ also found Reif not credible because Reif did not receive any customer complaints while struggling with symptoms and limitations before he ceased working at his copy machine servicer job. Tr. 402-03. While customer complaints would certainly support Reif's allegations of disabling symptoms and limitations, the absence of any such complaint does not conflict with any of Reif's claims. Thus, this is not a clear and convincing reason for rejecting Reif's testimony.

Third, the ALJ discredited Reif based on his daily activities. A claimant's daily activities can provide a clear and convincing reason for rejecting his subjective symptom testimony when they conflict with that testimony. *Molina v. Astrue*, 674 F3d 1104, 1113 (9th Cir 2012). The ALJ cited meal preparation, yard work and laundry, walking, driving, listening to music, and watching TV as activities that belie Reif's subjective symptom testimony. Tr. 402-03. However, Reif does not claim that his disability prevents him from doing any activities. Instead, he claims that his anxiety prevents him from performing work activities on a competitive basis. The ALJ failed to consider how the extent and scope of Reif's ability to perform his daily activities transfer to the demands of a competitive work environment or how these activities contradict his subjective symptom testimony. Thus, Reif's daily activities do not provide a clear and convincing reason to reject his statements.

Finally, as a tacit reason for rejecting Reif's credibility, the ALJ noted that Reif works part-time as a janitor and is able to visit with friends and neighbors. Tr. 404. The ALJ, however, mischaracterized Reif's activities. Reif's social contact with others is limited to speaking with a friend and only occasional visits with a former coworker. Tr. 352. Similarly, Reif's work as a janitor ranges from nine to 14 hours per week, and vocational expert Karl Smith opined that Reif performs his janitorial work at a level below competitive work requirements. Tr. 379. On this record, Reif's work and social activities do not provide a clear and convincing reason for rejecting Reif's testimony.

In sum, the ALJ failed to give clear and convincing reasons supported by substantial evidence in the record for finding Reif not credible.

## II.    Lay Testimony

Stan M. Crawford has known Reif since 1968 as a co-worker, friend, and employer. Tr. 107, 142. He wrote a letter to the Commissioner dated January 27, 2005, completed a third-party function report, and appeared and testified at the November 16, 2005 hearing. Tr. 106-07, 135-42, 364-74. In his letter, Mr. Crawford stated that Reif suffers from "increasingly more dehabilitating" anxiety-related difficulties and had problems coping with an eight-hour work day. Tr. 107. Because it was impossible for Reif to travel to receive training due to his anxiety and "with his memory and concentration slipping," he was "having problems trying to master and retain new service material." *Id*. At the hearing, Mr. Crawford testified that Reif was able to cover up his anxiety problems and continue to work, but gradually declined over the last two years to the point that he was unable to work even for a partial day. Tr. 368-71. Reif had an increasing problem with concentration, taking him longer to complete tasks. Tr. 374. He attributed much of the decline to the retirement of a salesman who had worked closely with and

provided support to Reif.  Tr. 370.  He kept Reif employed due to their long-term relationship.

Tr. 372.

As Reif's friend for over 15 years, Terry C. Dean completed a statement dated

November 19, 2005, regarding Reif's symptoms and limitations.  Tr. 180-81.  Mr. Dean

described Reif has having panic attacks "maybe 2 ½ to 3 hours up to 1 or 2 days after," leaving

him perspiring, disheveled, and with "unusual" eye contact.  Tr. 180.  Talking to Reif a

minimum of four times a week, he observed that Reif's memory and recall had deteriorated over

the two years prior to 2005.  Tr. 180-81.

The ALJ may discount the lay witness testimony if the ALJ gives reasons germane to the

witness.  *See, e.g., Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir 2009).  Here the ALJ deemed

this lay testimony "not highly credible" as "inconsistent with the objective medical record"

which "do not support the limitations, deficits, and difficulties described."  Tr. 404.  He

acknowledged that Mr. Crawford's information "is of somewhat greater value, in that [he] has

seen [Reif] in the work setting."  *Id.*  However, he concluded that Reif's "actual activities of

daily living, as well as his ongoing employment activity, demonstrate a level of functioning that

greatly exceeds and is incompatible with the reported observations of these two sources."  *Id.*

Although the ALJ did not indicate which medical evidence was supposedly inconsistent

with this lay testimony, the Commissioner points to the reports by Drs. Leland, Moore and

Cowan.  A close review of those reports fails to disclose such inconsistencies.

Dr. Leland, an examining psychologist, opined that "[f]rom a cognitive perspective," he

could find "no clear and convincing evidence that [Reif] is unable to work."  Tr. 272.  But he

added in the very next sentence that "the greater difficulties that are impacting [Reif's] general

functioning and employability are those related to his anxiety."  *Id.*  He later explained that Reif

suffers from anxiety which varies depending on environmental stressors and that when

experiencing acute stress, Reif "may be unable to maintain adequate attention" and "a moment of

'going blank.'"  Tr. 300.  In fact, Mr. Crawford attended Reif's interview with Dr. Leland and

"endorse[d]  that Mr. Reif has increasingly more difficulties on the job and hence his time has

been substantially reduced."  Tr. 272.  Nothing in Dr. Leland's report contradicts any testimony

by Mr. Crawford or Mr. Dean that Reif has memory problems due to his anxiety which increases

when under stress.

The Commissioner also cites Dr. Cowan as finding Reif "emotionally stable," "not

disheveled," and with no functional workplace limitations.  Tr. 759-62.  However, Dr. Cowan

observed Reif's general appearance during a 30-minute examination to determine his physical

limitations.  Reif's physical limitations are not the subject of the lay testimony, and Dr. Cowan

was not asked to provide any opinion as to any workplace limitations as a result of his anxiety.

Furthermore, during this brief examination, Reif apparently suffered no panic attack which,

according to Mr. Dean, leaves him disheveled.  Therefore, Dr. Cowan's report cannot be deemed

inconsistent with the lay testimony.

The ALJ also points to Dr. Moore's opinion that Reif has no limitations in activities of

daily living, moderate limitation in social functioning, and mild difficulty maintaining

concentration, persistence and pace.  Tr. 847-48.  However, nothing in Dr. Moore's testimony

reveals any inconsistency with the lay witnesses' observations of Reif, especially with respect to

his daily living activities or social functioning.  With respect to the extent of Reif's difficulty

with concentration, persistence and pace, Dr. Moore does not contradict Mr. Crawford's

observations regarding Reif's difficulties working at his prior job through 2004 which even the

ALJ found he can no longer perform.

It is also worth noting that the ALJ found Mr. Dean's information "of scant probative value, as all that is provided is a description of appearance that could be due to any number of factors." Tr. 404. This comment presumably refers to Mr. Dean's description of Reif's disheveled appearance after panic attacks. Tr. 180. However, the ALJ ignored the main point of Mr. Dean's written testimony that Reif suffers frequent panic attacks, presumably due to anxiety, and decreasing memory and recall.

In sum, the ALJ erred by failing to provide sufficient germane reasons for rejecting the lay witness testimony. *Lewis v. Apfel,* 236 F3d 503, 512 (9th Cir 2001).

**III.   Step Two Findings**

The ALJ found at step two that Reif's only severe impairment was related to his anxiety disorder. Tr. 400. Reif contests this finding, arguing that it was error to exclude his lumbar spine condition from the list of severe impairments.

At step two, based upon the medical evidence, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. 20 CFR §§ 404.1520(a), 416.920(a). An impairment is "not severe" if it "does not significantly limit [the claimant's] ability to do basic work activities." *Id*. "Omissions at step two are harmless if the ALJ's subsequent evaluation considered the effect of the impairment omitted at step two." *Harrison v. Astrue*, 2011 WL 2619504, at *7 (D Or July 1, 2011) (citation omitted).

The ALJ considered Reif's lumbar spine condition at step two, but found that the degree of deterioration in his spine was "consistent with [Reif's] age" and not a severe impairment. Tr. 399-400. The record contains a 2008 x-ray of Reif's spine that identifies significant narrowing at L2-3-5-SI. Tr. 783. The ALJ ignored this evidence and relied upon a 2009 x-ray that identified only mild degeneration, stating "the degree of deterioration is consistent with the

claimant's age." Tr. 783, 824. Medical evidence in the record shows that, contrary to the ALJ's assertion, Reif suffered from back pain and physical difficulties causing some functional limitations. For example, both Ms. Shawn and Dr. Cowan opined that Reif's lumbar impairment limited Reif's vocational abilities. Tr. 763 (limited to lifting 25 pounds frequently and 50 pounds occasionally), 831 (limited to "light and modified work" and to lifting 20 pounds). The ALJ did not specifically include any limitations related to Reif's lumbar impairment in his subsequent RFC assessment.

Nonetheless, the Commissioner argues that this omission was harmless because the ALJ found that Reif could perform jobs identified by the VE as the "light level of exertion, accommodating any limitations recited in recent evaluations." Tr. 411. Even though the RFC imposes no exertional limitations, nothing in the record related to Reif's lumbar impairment limits him to anything less than performing light work. In fact, Reif concedes that he is physically capable of performing light work. Since the VE identified only jobs requiring light work, the omission of Reif's lumbar spine impairment at step two was harmless error. *See Stubbs-Danielson v. Astrue*, 539 F3d 1169, 1174 (9th Cir 2008) (erroneously omitting postural limitations was harmless error when sedentary jobs identified).

## IV.    RFC Assessment

In his RFC assessment, the ALJ found that Reif could perform work at all exertional and skill levels, but limited him to environments without concentrated exposure to noise, crowds, or crowded areas, and no more than superficial contact with coworkers. Tr. 402. Reif argues that this RFC improperly excluded limitations supported by the medical record.

Given his age and education, Reif first argues that he is presumptively disabled because he is unable to perform past work, is limited to light exertion, and lacks the capacity to transfer

skills effectively to other work.  20 CFR 404 Subpart P, Appendix 2, Rule 202.06.  To find skill

transferability at Reif's age (age 60 or older), "there must be very little, if any, vocational

adjustment required in terms of tools, work processes, work settings, or the industry."  *Id* at Rule

202.00(f).  Citing Mr. Smith, Reif asserts that he cannot perform work to which his skills

transfer.  To the contrary, Mr. Smith opined that Reif's "skills would be transferable quite easily

to a variety of other jobs," including assembly work.  Tr. 778.  His conclusion that Reif is unable

to perform competitive work is not based on Reif's lack of transferable skills, but on his need for

a sheltered environment to accommodate his anxiety.  In other words, Reif has the skills to

perform both semi-skilled and unskilled light work, but contends that his anxiety prevents him

from performing such work on a full-time basis.  Therefore, he cannot be deemed presumptively

disabled based on the Medical-Vocational Guidelines.

Second, Reif argues that the ALJ improperly excluded limitations from the RFC that he

can only perform "simple, repetitive, routine work," has low verbal memory retrieval, must

check a notebook for instructions, and goes blank unpredictably.  In support, Reif relies on

Dr. Leland's report of which both the ALJ and Dr. Moore highly approved.  Based on scores of

"low average" for both "Auditory-Immediate" and "Immediate Memory," "extremely low" for

"Auditory Recognition Delayed," and "borderline impaired" for "General Memory," Dr. Leland

stated that Reif "might experience intermittent difficulties with short-term verbal memory" and

that a "typical compensatory strategy is to carry a notebook and write down instructions or

important information."  Tr. 297.  He later explained that due to his fluctuating anxiety, Reif:

> may experience during moments of intense anxiety difficulties
> concentrating or attending to stimuli.  If he is unable to maintain adequate
> attention, he may experience problems with storage of memory or in
> some cases retrieval of information already stored.  He may experience a
> moment of "going blank" during an acute stressful situational.

Tr. 300.

In addition, individuals who score similar to Reif on the MMPI-II "are typically described as experiencing moderate to significant distress" and "may have difficulties concentrating and keeping focused on a task or a job." Tr. 301.

In formulating his RFC, the ALJ relied solely on Dr. Leland's assessment that Reif has "slight limitations in the ability to understand, remember and carry out detailed instructions" and moderate, but likely transitory restrictions "in the ability to respond appropriate to work pressures." Tr. 408, citing Tr. 290, 301-02. He found this assessment to be "consistent with the treatment record" and to indicate that Reif is "able to function satisfactorily." *Id*. However, as explained by Mr. Smith who reviewed Dr. Leland's report, Dr. Leland was "carefully and only commenting on Mr. Reif's ability in a specific situation," namely his ability to "function in a fairly simple straightforward work situation where anxiety is not being experienced or a high stress environments is not experienced regularly, if at all." Tr. 777.

The ALJ rejected Mr. Smith's opinion because it also considered Dr. Burns's report which Dr. Moore found unpersuasive. Tr. 409. The ALJ is correct that Mr. Smith did consider Dr. Burns's report, but only after spending two pages summarizing and trying to make sense out of Dr. Leland's opinion. Excluding any reference to Dr. Burns's report, Mr. Smith concluded that Dr. Leland "describes a person who has difficult working regular hours." Tr. 778. The ALJ gave no legitimate reason to reject that portion of Mr. Smith's opinion. By failing to incorporate into the RFC those portions of Dr. Leland's opinion which Mr. Smith found critical to his opinion, the ALJ erred.

///

///

///

Page 18 – OPINION AND ORDER

**IV.**    <u>**Remand**</u>

The decision whether to remand for further proceedings or for immediate payment of

benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir

2000), *cert. denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings.

A remand for an award of benefits is appropriate when no useful purpose would be served by

further administrative proceedings or when the record has been fully developed and the evidence

is insufficient to support the Commissioner's decision. *Strauss v. Comm'r*, 635 F3d 1135,

1138-39 (9th Cir 2011). The court may not award benefits punitively and must conduct a "credit-

as-true" analysis to determine if a claimant is disabled under the Act. *Id* at 1138.

Under the "crediting as true" doctrine in the Ninth Circuit (which the Commissioner

opposes), evidence should be credited and an immediate award of benefits directed where

"(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are

no outstanding issues that must be resolved before a determination of disability can be made; and

(3) it is clear from the record that the ALJ would be required to find the claimant disabled were

such evidence credited." *Id.* The "crediting as true" doctrine is not a mandatory rule in the

Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of

benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876

(9th Cir 2003), citing *Bunnell v. Sullivan*, 947 F2d 341, 348 (9th Cir 1991). The reviewing court

declines to credit testimony when outstanding issues" remain. *Luna v. Astrue*, 623 F3d 1032,

1035 (9th Cir 2010).

As discussed above, the ALJ erred by rejecting Reif's testimony, rejecting the lay witness

testimony, and failing to include all of Reif's non-exertional limitations in the RFC. Turning to

the other two facets of the *Harman* inquiry, no outstanding issues must be resolved before a

determination of disability can be made.  Although Reif may have had the exertional ability to perform light work, the erroneously rejected evidence establishes that the symptoms and limitations related to Reif's anxiety disorder include low verbal memory retrieval, a need to check a notebook for instructions, and going blank unpredictably.

The VE testified that an individual who was off-task, whether checking a notebook or going blank unpredictably, 10% of the time would not be able to sustain competitive employment at any skill level.  Tr. 879-80.  While the record is less than crystal clear as to how often Reif would be off-task, the record supports the reasonable inference that it occurred frequently.  In March 2004, he reported to Dr. Climer that he had "frequent spells" when he had to leave work.  Tr. 217.  According to Reif's testimony, which should be credited as true,  he suffers from dizziness from one to three times a day for 30 to 60 minutes.  Tr. 246, 356.  Mr. Crawford confirms that Reif found it impossible to attend out-of-town training and went to great lengths to "mask" his symptoms from customers.  Between 2002 and 2004, his employment was not "competitive" in any sense of the word.   Instead, he was able to retain his job, working fewer and fewer hours per week, because his boss happened to be someone he had worked with for three decades who was concerned about him as a friend.  The only work he has been able to perform since 2005 is part-time janitorial work and, even then, has difficulties if his routine changes.  In February 2009, Ms. Alexander confirmed that Reif had "marked"  limitations in multiple points of inquiry related to "Understanding and Memory," "Sustained Concentration and Persistence," and "Adaption."  Tr. 768-69.

As the Ninth Circuit has noted, "[m]ost light-work jobs … require a *continuous presence*; one cannot simply abandon his post or duties for several minutes without seriously disrupting his job."  *Erickson v. Shalala*, 9 F3d 813, 818 (9th Cir 1993).  This credited evidence leads to the

conclusion that due to his anxiety which takes him off-task frequently, Reif cannot maintain a

"continuous presence" in any job.  Thus, it is clear from the record that Reif cannot

competitively perform any jobs that exist in the national economy.  The ALJ's decision is

therefore reversed, and this case is remanded for immediate payment of benefits.

## **<u>ORDER</u>**

For the reasons discussed above, the Commissioner's decision is REVERSED AND

REMANDED pursuant to Sentence Four of 42 USC § 405(g) for an award of benefits.

DATED this 5th day of March, 2015.

s/ Janice M. Stewart_____ _____
Janice M. Stewart
United States Magistrate Judge